UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re: SCOTT A. BUSHEY,     No. 7-15-10784 JA

    Debtor.

ROGER CRONK, NANCY CRONK,
BRANDON ASHCRAFT, AMBER ASHCRAFT,
and BLOND AND BITTER, LLC,

    Plaintiffs,

v.     Adversary Proceeding No. 15-1066 J

SCOTT A. BUSHEY,

    Defendant.

UNITED STATES TRUSTEE,

    Plaintiff,

v.     Adversary Proceeding No. 15-1068 J

SCOTT A. BUSHEY,

    Defendant.

### MEMORANDUM OPINION

The Court held a combined trial on the merits of the above adversary proceedings[1] which seek to deny Defendant Scott A. Bushey's discharge under various subsections[2] of 11 U.S.C. § 727.[3] After considering the evidence, the Court finds that Mr. Bushey knowingly and

---

[1] Plaintiffs Roger Cronk, Nancy Cronk, Brandon Ashcraft, Amber Ashcraft, and Blond and Bitter, LLC (together, "Plaintiffs" or "Ashcraft/Cronk") were represented at trial by James Boone. Leonard Martinez Metzgar represented the United States Trustee (the "UST"). Christopher M Gatton represented Defendant Scott A. Bushey.

[2] Plaintiffs asserted objections to discharge under § 727(a)(2)(A) (concealment of property with intent to hinder, delay or defraud a creditor); § 727(a)(3) (failure to maintain records); and § 727(a)(5) (failure to satisfactorily explain loss of assets). Because the Court finds that Defendant's discharge should be denied under § 727(a)(4), the Court need not address the remaining objections to discharge.

[3] All future statutory references in this Memorandum Opinion are to Title 11 of the United States Code.

fraudulently made false oaths in connection with his bankruptcy case, warranting the denial of his discharge under § 727(a)(4). Mr. Bushey concocted a scheme to divest himself of ownership of his business and free himself from his Small Business Association ("SBA") guaranty, yet continue to operate and benefit from the business as if he were its owner. He intentionally lied about these business transactions at a Rule 2004 Examination and depositions taken in connection with his bankruptcy case. Those falsehoods will cost him his discharge.

FACTS

Defendant Scott Bushey owned and operated tanning salons in Albuquerque, New Mexico. Many people who knew him felt his charisma. In fact, the success of his tanning salons was due in large part to his ability to empower people. He operated his tanning salon business under the corporate name Sun Center of America, Inc. ("Sun Center"). Mr. Bushey was the president and 100% shareholder of Sun Center. He also franchised the tanning salon business under the name Solarius Lifestyle Spa through another business entity, Solarius Franchising, LLC ("Solarius"). In 2007, Mr. Bushey, through Solarius, sold a franchise to Blonde & Bitter, LLC ("B & B"), a limited liability company formed and owned by Brandon Aschraft and his wife, Amber Ashcraft. B & B planned to open a tanning salon on Alameda Boulevard in Albuquerque.

B & B obtained an SBA guaranteed loan in the amount of $495,200.00 from First Community Bank. *See* Exhibit 192. Brandon and Amber Ashcraft, along with Mr. Ashcraft's parents, Roger and Nancy Cronk, guaranteed the loan. *Id.* The store opened in the spring of 2008, but failed to meet the anticipated sales projections. Sun Center, acting through its agent, Mr. Bushey, agreed to take over the business and assume the loan. Sun Center entered into an agreement with B & B to repurchase the franchise and assume certain obligations. Ultimately,

however, Plaintiffs filed a lawsuit against Mr. Bushey, Sun Center, and Solarius over disputes concerning the franchise agreement and Sun Center's agreement to repurchase the franchise and assume certain obligations.  The parties entered into an agreement in February of 2009 to settle their dispute.  *See* Settlement Agreement and Mutual Release ("Settlement Agreement") – Exhibit 207.  As part of the Settlement Agreement, Mr. Bushey guaranteed the SBA loan.  *Id.* Sun Center assumed the loan, but First Community Bank would not release the Cronks or the Ashcrafts from their personal guaranties.  Mr. Bushey executed an SBA Unconditional Guarantee on May 30, 2009.  *See* Exhibit 192, p. 45. An addendum to the Settlement Agreement provided that First Community Bank's release of Plaintiffs would not be required until November 30, 2015 and that Mr. Bushey, Sun Center, and Solarius would seek to refinance the loan.  *See* Addendum to Settlement Agreement and Mutual Release ("Addendum") – Exhibit 207.  The Addendum provided further that Plaintiffs had the option to reassume operation, ownership and control of the tanning salon in the event Sun Center defaulted in payments due First Community Bank. *Id.*  Sun Center defaulted under the loan, but neither Sun Center nor Mr. Bushey ever gave Plaintiffs the option to reassume the operation, ownership, and control of the tanning salon as contemplated under the Addendum.

The Sale of Sun Center America, Inc. to Alameda Assets Management, Inc.

U.S. Bank acquired First Community Bank and became the holder of the loan.  Mr. Bushey contacted Second Wind Consultants, Inc. ("Second Wind") sometime in 2012 to assist him with respect to the loan.  He executed a Contract for Services from Second Wind on November 15, 2012.  *See* Exhibit 1.  Second Wind's stated strategy was to "prepare . . . for the implementation of the workout, which will include: a. A plan to protect the business assets . . . from the secured creditors b. If appropriate, . . . design and implement the asset sale which is the

3

foundation of the re-organization." *Id.* The Contract for Services also contemplated that Second Wind would assist in settling Mr. Bushey's personal guaranty of the loan "[o]nce the assets are transferred and thus the business is re-organized under a new entity, with the assets (the collateral for the original loan) being released by the bank . . ." *Id.*

Vance Dugger and Mr. Bushey were friends at one time. Mr. Dugger first met Mr. Bushey when Mr. Dugger went to the tanning salon as a customer. They went to bible study together. Mr. Bushey attended Mr. Dugger's wedding. At some point, Mr. Bushey suggested to Mr. Digger that he consider taking over Sun Center's tanning salon business. Mr. Dugger agreed that he would purchase the business and allow Mr. Bushey to continue to work at the business and act as its manager.

On September 20, 2013, Sun Center and Alameda Assets Management, LLC ("Alameda Assets") entered into a Purchase and Sale Agreement for the sale of substantially all of Sun Center's assets to Alameda Assets for $30,000.00. *See* Exhibit 9. Mr. Dugger owned 100% of Alameda Assets. The amount of the purchase price was the amount U.S. Bank agreed to accept from the buyer in exchange for releasing its lien against the assets. Mr. Dugger did not have any direct contact with U.S. Bank before the sale. Nor did Mr. Dugger have any direct contact with Second Wind regarding the transaction. Mr. Dugger understood that Second Wind prepared the documents for the transaction. Mr. Dugger agreed to the asset sale to help his friend, Mr. Bushey. Mr. Dugger does not remember reviewing any profit and loss statements, tax returns, or payroll records before agreeing to purchase the business. Even though Mr. Dugger was willing to help Mr. Bushey, Mr. Dugger made it clear that he would not put up the money to purchase the business; Mr. Bushey would have to come up with the money himself.

4

Mr. Bushey provided from his personal assets the $30,000 purchase price for the sale of Sun Center's assets to Alameda Assets. To fund the purchase price, Mr. Bushey obtained a loan secured by a 2008 GMC truck. The owner listed on the title on the 2008 GMC truck is Scott Bushey. He took $25,000 in cash from the loan and deposited it into his girlfriend's checking account. *See* Exhibit 16. Mr. Bushey then withdrew money from the account, placed the cash in an envelope, and brought it to Mr. Dugger's office.[4]

U.S. Bank released its lien on the collateral pledged to secure the loan to Sun Center upon its receipt of $30,000. *See* Letter from U.S. Bank to Sun Center confirming U.S. Bank's preliminary approval of the release of its security interest in Sun Center's assets upon receipt of $30,000, acknowledged by Sun Center and Mr. Bushey - Exhibit 101. U.S. Bank agreed to accept $30,000 in exchange for releasing its lien against the assets based on its belief that the purchase and sale transaction was at arm's length. Mr. Bushey, on behalf of Sun Center, and Mr. Dugger, on behalf of Alameda Assets signed an Affidavit of "Arms Length Transaction" in connection with the sale of Sun Center's assets to Alameda Assets. *See* Exhibit No. 103. A Notice of Value issued by the Bernalillo County Assessor in May of 2013 valued Sun Center's business equipment at $90,356 for its business located on Montgomery Boulevard. *See* Exhibit 21.

Mr. Bushey took an active role in perpetrating a scheme to form a new entity to acquire Sun Center's assets and obtain a release of lien from U.S. Bank by falsely making it appear to be an arm's length transaction. Mr. Bushey's secret funding of the purchase price, and emails from Mr. Bushey to Second Wind, support this finding. *See* Exhibit 79 – Email dated December 4, 2013 from Mr. Bushey to Donald Todrin of Second Wind ("The transition of making a new LLC

---

[4] The evidence does not clearly establish the source of the additional $5,000 used to make up the $30,000 purchase price.

5

for the purchase of assets has also been an additional expense that far exceeds what I could have imagined because of the increased insurance expenses that I am having to pay as a result of protecting 'the Buyer' of the assets."). Mr. Bushey's email communication to Second Wind also appears to confirm that Mr. Bushey put up the $30,000 purchase price. *Id.* ("I have basically lost an additional $30K in cash this year due to the circumstances of the workout not going according to plan."). Mr. Bushey never informed Plaintiffs of Sun Center's asset sale to Alameda Assets.

After Alameda Assets took over the business, Mr. Bushey continued to work at the tanning salon. He continued to treat the business as if he owned it. He was the authorized signor on Alameda Assets' checking account. He made several business trips, including travel to trade shows, and charged the travel and entertainment expenses to Alameda Assets. He also had Alameda Assets pay some of his personal expenses. He signed two checks for $5,168.46 each using Alameda Assets' checking account to purchase a motorcycle for himself. *See* Exhibit 26, p. 59. In connection with his purchase of a $110,000 Porsche, Mr. Bushey represented to the car dealer that he was the CEO of Sun Center earning a $300,000 annual salary. *See* Exhibit 31. At that time, Sun Center had already sold its assets to Alameda Assets. Mr. Bushey continued to have Alameda Assets pay the premiums on his whole life insurance policy. *See* Exhibit 30, p. 33 (signing a request for electronic funds transfer for payment of the insurance policy premiums from Alameda Assets' account; Mr. Bushey signed the request as "general partner managing operator"). Mr. Bushey did not have a membership interest in Alameda Assets.

<u>The Sale of Membership Interests in Alameda Assets Management, Inc. to Charles O'Donnell</u>

Mr. Dugger eventually became frustrated with the way Mr. Bushey was managing Alameda Assets because Mr. Bushey was operating the business as if he still owned it. Mr. Bushey would not take direction from Mr. Dugger about how to run the business or keep business

6

books and records in the manner Mr. Dugger required. On October 1, 2014, Mr. Dugger and Charles O'Donnell executed a Membership Interests Purchase Agreement (the "Sale Agreement"). *See* Exhibit 19. Under the Sale Agreement, Mr. O'Donnell acquired from Mr. Dugger 100% of the membership interests of Alameda Assets. *Id.* The Sale Agreement contains a stated purchase price of $35,000. *Id.* Mr. O'Donnell signed a Demand Promissory Note in favor of Vance Dugger in the amount of $30,000. *Id.* at p. 12. Mr. Bushey had introduced Mr. O'Donnell, who was also a customer at the salon, to Mr. Dugger. One day Mr. Dugger, Mr. O'Donnell, and Mr. Bushey had a heated conversation at Mr. Dugger's office. Mr. Dugger told Mr. Bushey that Mr. Bushey owed him money. Mr. Bushey reached into his pockets and handed Mr. Dugger approximately $1,700, which Mr. Bushey said was "all the money I have left to my name."

Despite the Sale Agreement, $1,746 was the figure ultimately used as the purchase price for the sale of Mr. Dugger's interest in Alameda Assets to Charles O'Donnell. A document called Release of Demand Promissory Note ("Release") purports to release all obligations under the Demand Promissory Note upon receipt of a "Lump sum payment of $1,746." Exhibit 19, p. 13. Once again, Mr. Bushey was the source of the money used for the sale. Mr. O'Donnell did not pay any money to acquire the membership interests of Alameda Assets. He did not pay $35,000 as reflected in the Sale Agreement; he did not pay the $30,000 under the Demand Promissory Note, and he did not pay the lump sum figure reflected in the Release. The Release does not contain Mr. Dugger's signature, yet it is clear from Mr. Dugger's testimony that Mr. Dugger received that sum of money and believes he sold his interest in Alameda Assets to Mr. O'Donnell. Mr. O'Donnell acquired the business for nothing. Mr. Bushey orchestrated the transaction and

7

provided the money to close the sale, just as he did for Mr. Dugger when Alameda Assets purchased the assets of Sun Center.

After Mr. O'Donnell acquired Alameda Assets, Mr. Bushey's girlfriend, Cecelia De La Fuente, served as the manager for a salary of $3,800 monthly, plus commissions. *See* Exhibit 20. Mr. Bushey's income from working at the salon was reduced to $1,000 per month. Mr. Bushey would give his paycheck to Ms. De la Fuente for use towards payment of the couple's shared household expenses. Because Ms. De la Fuente earned more money, she paid most of Mr. Bushey's household expenses. Post-petition, Mr. Bushey again served as manager of the business, and his salary increased to approximately $72,000 per year. Mr. O'Donnell has never taken an active role in the operation of the business. He does not regularly review the books and records of the business, give any direction to Mr. Bushey or Ms. De La Fuente regarding the operation of the business, or get involved in day-to-day business operations. Mr. O'Donnell's main concern is that Alameda Assets is current on all taxes because of his pass through tax liability. His accountant ensures that all of Alameda Assets' taxes are timely paid.

<u>The false oaths made in connection with Mr. Bushey's bankruptcy case</u>

*Meeting of Creditors*

At the § 341(a) meeting of creditors, Mr. Bushey testified under oath that his business was taken back by U.S. Bank. When asked whether U.S. Bank repossessed the assets of the business, Mr. Bushey confirmed that it did. Mr. Bushey testified further at the § 341(a) meeting that U.S. Bank required him to sell the assets. Mr. Bushey also testified that he and Mr. Dugger were not friends. At a subsequent deposition, Mr. Bushey clarified that he and Mr. Dugger had been friends before the sale of Sun Center to Alameda Assets, but that after the sale their friendship had soured.

*Rule 2004 Exam and deposition testimony*

Mr. Bushey submitted to an examination under Fed. R. Bankr. P. 2004 (the "Rule 2004 Exam") on June 5, 2015. At the Rule 2004 Exam, Mr. Bushey testified under oath that he had nothing to do with the $30,000 payment to U.S. Bank, had nothing to do with the transaction involving the sale of Sun Center's assets to Alameda Assets, and that U.S. Bank required the sale of assets. He testified further that Mr. Dugger paid the $30,000 purchase price and that he did not know where Mr. Dugger obtained the money to purchase Sun Center's assets. At a subsequent deposition on April 22, 2016, Mr. Bushey testified under oath that he did not sell the business. At yet another deposition, Mr. Bushey denied under oath that he put up the money for Alameda Assets to purchase Sun Center's assets. He testified that Sun Center provided the money. These statements made under oath were false. Mr. Bushey knew they were false statements when he made them, and he made them with intent to defraud.

Mr. Bushey also falsely testified under oath that he was not involved in the sale of Alameda Assets to Mr. O'Donnell. He testified at the Rule 2004 Exam that he knew of no reason why the note signed by Charles O'Donnell in favor of Alameda Assets was released for $1,746, and that he had nothing to do with the release of the note for $1,746. At a subsequent deposition, Mr. Bushey admitted that he gave the $1,746 to Mr. Dugger. It is clear from Mr. Bushey's false and inconsistent statements made under oath at his Rule 2004 Exam and in deposition testimony that Mr. Bushey wanted to hide from his creditors his participation in the sale of Sun Center to Alameda Assets and the sale of the interests in Alameda Assets to Mr. O'Donnell. He concealed his participation in these transactions because he did not want B & B, the Ashcrafts and the Cronks to find out about it.

9

*Statement of Financial Affairs and Schedules*

Mr. Bushey did not list the SBA as a creditor or otherwise list his SBA guaranty in his Schedules. Nor did Mr. Bushey schedule the Ashcrafts, Cronks, or B & B as creditors. Instead, Mr. Bushey identified B & B and "Ashcraft and Cronk" as co-debtors on Schedule H. "Aschraft & Cronk" and B & B were included on the creditor mailing list care of The Chappell Law Firm. Mr. Bushey formed a business entity in 2013 called DELAFUENTE/BUSHEY, L.L.C. *See* Exhibit 201. He did not list his interest in DELAFUENTE/BUSHEY, L.L.C. in his Schedules or Statement of Financial Affairs. He considered that entity a "place holder."

On Schedule B, Mr. Bushey disclosed that he was the 100% owner of Sun Center, but that the business closed in December 2013. Mr. Bushey listed income from Solarius Consulting for 2015 and 2014 on his SOFA, Item 1 – Income from employment or operation of business. In actuality, Alameda Assets employed him during those years. Mr. Bushey testified that he considered Solarius Consulting a "d/b/a" of Alameda Assets.

Line 10 of the SOFA directs the debtor to list all transfers of property (other than in the ordinary course of business) made within two years before the date of the commencement of the bankruptcy case. Mr. Bushey checked the box "None" in Line 10. Mr. Bushey did not disclose the sale of his 2008 GMC Truck in response to Line 10. In his mind, even though the 2008 GMC Truck was titled in his name, Sun Center paid for the truck and the truck was used for business purposes. He considered it an asset of the business.

On Schedule I, Mr. Bushey listed a contribution of $2,800 from his girlfriend, Cecelia de La Fuente as part of his monthly income. He also identified Ms. De La Fuente as a dependent. Mr. Bushey did not include Ms. De La Fuente's monthly expenses on Schedule J.

Mr. Bushey filed a proof of claim in the Vaughan Company, Realtors ("VCR") bankruptcy case. He did not list that claim on Schedule D.

DISCUSSION

Bankruptcy affords debtors a way to "reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'" *Grogan v. Garner,* 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991) (quoting *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)). Because of this "fresh start" policy, "[e]xceptions to discharge are to be narrowly construed, and . . . doubt is to be resolved in the debtor's favor." *Affordable Bail Bonds, Inc. v. Sandoval (In re Sandoval),* 541 F.3d 997, 1001 (10th Cir. 2008) (quotation marks and citation omitted).[5] Even so, bankruptcy relief generally is limited "to the honest but unfortunate debtor." *Grogan,* 498 U.S. at 287 (quotation marks and citation omitted).[6]

Denial of discharge is a particularly harsh penalty because it prevents a debtor from discharging *any* pre-petition debts.[7] The party objecting to discharge under 11 U.S.C. § 727 bears the burden of proving, by a preponderance of the evidence, that the debtor's discharge should be denied.[8]

---

[5] *See also Gullickson v. Brown (In re Brown),* 108 F.3d 1290, 1292 (10th Cir. 1997) ("[T]he Bankruptcy Code must be construed liberally in favor of the debtor and strictly against the creditor.") (citation omitted).

[6] *See also In re Juzwiak,* 89 F.3d 424, 427 (7th Cir. 1996) ("[A] discharge in bankruptcy is a privilege, not a right, and should only inure to the benefit of the honest debtor.") (citations omitted).

[7] *See Blackwell Oil Co., Inc. v. Potts (In re Potts),* 501 B.R. 711, 726 (Bankr. D. Colo. 2013) (acknowledging that denial of discharge is a "harsh penalty") (citation omitted); *Associated Bank, N.A. v. Sever (In re Sever),* 438 B.R. 612, 619 (Bankr. C.D. Ill. 2010) ("A denial of discharge is an extremely harsh and drastic penalty.") (citation omitted). *See also Rosen v. Bezner,* 996 F.2d 1527, 1531 (3d Cir. 1993) ("Completely denying a debtor his discharge . . . is an extreme step and should not be taken lightly.").

[8] *See* Fed. R. Bankr. P. 4005 ("At the trial on a complaint objecting to a discharge, the plaintiff has the burden of proving the objection."); *Brown,* 108 F.3d at 1293 and 1294 (preponderance of the evidence standard for claims under § 727(a)(2)(A) and § 727(a)(4)).

Plaintiffs and the United States Trustee request the Court to deny Mr. Bushey's discharge under § 727(a)(4). Under that section, a debtor's discharge may be denied upon a finding that "the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account." 11 U.S.C. § 727(a)(4). "A debtor's petition, schedules, statement of financial affairs, statements made at a 341 meeting, testimony given at a Federal Rule of Bankruptcy Procedure 2004 examination, and answers to interrogatories all constitute statements under oath for purposes of § 727(a)(4)." *Freelife Int'l, LLC v. Butler (In re Butler),* 377 B.R. 895, 922 (Bankr. D. Utah 2006) (internal quotation marks and citation omitted).[9] "To trigger section 727(a)(4), the false oath must relate to a material matter and must be made willfully with intent to defraud." *Job v. Calder (In re Calder),* 907 F.2d 953, 955 (10th Cir. 1990). *See also, Brown,* 103 F.3d at 1294 (denial of discharge based on false oath requires a showing "by a preponderance of the evidence that the debtor knowingly and fraudulently made an oath and that the oath relates to a material fact.") (citation omitted).

A false oath is material "'if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property.'" *United States Trustee v. Garland (In re Garland),* 417 B.R. 805, 814 (10th Cir. BAP 2009) (quoting *Chalik v. Moorefield (In re Chalik),* 748 F.2d 616, 618 (11th Cir. 1984)).[10] When the debtor's false oath "prevents the trustee or a creditor from fully examining the debtor's

---

[9] *See also In re Calder,* 907 F.2d 953, 955 (10th Cir. 1990) (acknowledging that "an omission of assets from a Statement of Affairs or schedule may constitute a false oath under section 727(a)(4)(A).") (citation omitted); *United States Trustee v. Zhang (In re Zhang),* 463 B.R. 66, 86 (Bankr. S.D. Ohio 2012) ("[A]ny false statement made by the debtor in the debtor's schedules, at a creditors' meeting held pursuant to § 341, or during a deposition relating to the debtor's assets and financial circumstances could potentially lead to denial of a debtor's discharge under § 727(a)(4) if all of the required elements to establish that exception are proven.").

[10] *See also, In re Retz,* 606 F.3d 1189, 1198 (9th Cir. 2010) ("A fact is material if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property.") (internal quotation marks and citations omitted); *Premier Capital, LLC v. Crawford (In re Crawford),* 841 F.3d 1, 8 (1st Cir. 2016) (same).

12

pre-bankruptcy financial dealings," the false oath may satisfy the materiality requirement sufficient to deny the debtor's discharge. *United States Trustee v. Keck (In re Keck),* 363 B.R. 193, 201 (Bankr. D. Kan. 2007) (relating to the debtor's failure to disclose assets of little or no value). Satisfaction of the materiality requirement has a fairly low threshold, and is not dependent upon whether the false oath has in fact been detrimental to creditors. *See Premier Capital, LLC v. Crawford (In re Crawford),* 841 F.3d 1, 8 and 9 (1st Cir. 2016) (observing that "the threshold to materiality is fairly low" and explaining further that "the materiality of the false oath will not depend upon whether in fact the falsehood has been detrimental to creditors.") (internal quotation marks and citations omitted). *See also, Olympic Coast Investment, Inc. v. Wright (In re Wright),* 364 B.R. 51, 74 (Bankr. D. Mont. 2007) (explaining that an omission can be material "'if the omission adversely effects the trustee's or creditor's ability to . . . fully investigate the debtor's pre-bankruptcy dealing and financial condition.'") (quoting 6 King, COLLIER ON BANKRUPTCY ¶ 727.04[1][b]).

    Because a debtor is unlikely to admit to an intention to defraud, the Court may infer the debtor's fraudulent intent from the surrounding facts and circumstances. *Calder,* 907 F.2d at 955-56 (observing that "the debtor will be the only person able to testify directly concerning his intent and he is unlikely to state that his intent was fraudulent[,]" and stating that '[t]herefore, fraudulent intent may be deduced from the facts and circumstances of a case.") (citations omitted).[11] The Court will not, however, deny a debtor's discharge if the debtor's false oath is the result of an honest error, mistake, inadvertence, or mere inaccuracy. *Brown,* 108 F.3d at 1294-95 (citations omitted).

---

[11] *Cf. Mathai v. Warren (In re Warren),* 512 F.3d 1241, 1249 (10th Cir. 2008) (discussing actual intent to defraud under § 727(a)(2), and observing that "[b]ecause rare is the occasion when a party lays bare his or her subjective intent, '[f]raudulent intent . . . may be established by circumstantial evidence, or by inferences drawn from a course of conduct.'") (quoting *Farmers Coop. Ass'n of Talmage, Kan. v. Strunk,* 671 F.2d 391, 395 (10th Cir. 1982)).

13

*False oaths – testimony*

      a) *§ 341(a) Meeting of Creditors*

Mr. Bushey testified under oath at the § 341(a) meeting of creditors that his business was taken back by U.S. Bank and that U.S. Bank required him to sell the assets. He did not offer any further explanation about that transaction; he did not disclose any information about the source of the $30,000. But he was not asked at the § 341 meeting of creditors to provide any more details about that transaction. Mr. Bushey's testimony at the § 341 meeting of creditors may have left the Chapter 7 trustee with a false impression of the transaction, but because no additional questions were asked, such testimony fails to satisfy the knowing and fraudulent requirement for denial of discharge under § 727(a)(4).

      b) *Rule 2004 Exam and Depositions*

Although Mr. Bushey's testimony at the § 341(a) meeting of creditors falls short of the required standard for denial of discharge, his subsequent false testimony at his Rule 2004 Exam and at subsequent depositions regarding his role in the transactions involving the sale of his business warrants the denial of Mr. Bushey's discharge under 11 U.S.C. § 727(a)(4).

Mr. Bushey testified under oath at his Rule 2004 Exam that he had nothing to do with the payment of $30,000 to U.S. Bank and had nothing to do with the transaction involving the sale of Sun Center's assets to Alameda Assets. He falsely testified that Mr. Dugger paid the $30,000 purchase price when, in fact, Mr. Bushey provided the funds for the asset sale to Alameda Assets. He made Sun Center's sale of assets to Alameda Assets appear to be an arm's length transaction to deceive U.S. Bank so it would release its lien for $30,000. Mr. Bushey funded the $30,000 purchase price for the sale of Sun Center's assets to Alameda Assets from funds he obtained from the 2008 GMC titled in his name. He put the funds in his girlfriend's bank

14

account, then withdrew the cash and put it in an envelope so that it would not appear that he was the source of the funds. Mr. Bushey also gave false deposition testimony under oath that he was not involved in the sale of the membership interests in Alameda Assets to Mr. O'Donnell. Yet he introduced Mr. O'Donnell to Mr. Dugger and, once again, provided the purchase price with his own funds.

Mr. Bushey concealed his role in these transactions because he did not want his creditors, especially B & B, the Ashcrafts, and the Cronks, to find out that he provided the purchase price in both transactions. By falsely testifying that he was not involved and did not know where Mr. Dugger came up with the funds to purchase Sun Center's assets, Mr. Bushey intended to prevent creditors from understanding the true nature of his business transactions. These transactions made it look like Mr. Bushey did not own or control the business, yet Mr. Bushey continued to operate the business as if he were the owner. Even though the transactions occurred long before the petition date, these misstatements are material because they relate to Mr. Bushey's business dealings and the disposition of his assets. Mr. Bushey's blatantly false testimony at the Rule 2004 Exam and subsequent depositions was made with the intent to obfuscate his participation in these transactions in order to conceal his fraudulent scheme and potentially avoid objections to his discharge or to the dischargeability of particular debts.

"The fundamental purpose of § 727(a)(4) is to insure that the trustee and creditors have accurate information without having to conduct costly investigations." *Davis v. Weddington (In re Weddington),* 457 B.R. 102, 113 (Bankr. D. Kan. 2011) (citing *Retz,* 606 F.3d. at 1196). By concealing his participation in these pre-petition business transactions, Mr. Bushey caused his creditors to have to dig out the truth.

*False oaths – SOFA and Schedules*

15

Mr. Bushey's SOFA and Schedules contain some omissions and false statements. Yet some of these false statements and omissions resulted from mere inadvertence or inattention to detail and were not fraudulent. For example, Mr. Bushey's omission of his girlfriend's expenses on Schedule J despite listing her as a dependent is more likely unintentional than knowing and fraudulent.[12] Failing to list Ms. De La Fuente's expenses on Schedule J while at the same time accounting for a $2,800 monthly contribution to his income on Schedule I garners no advantage to Mr. Bushey. Mr. Bushey failed to disclose his interest in BUSHEYDELAFUENTE, LLC in his schedules because he created that entity merely as a "place holder" that did not conduct any business. Mr. Bushey forgot to list as an asset in his schedules a claim he filed against the VCR bankruptcy estate. Similarly, even though Mr. Bushey failed to schedule B & B, the Ashcrafts and the Cronks as creditors, he listed them as co-debtors, which provided these creditors with notice of his bankruptcy filing. The Court concludes that these omissions were inadvertent.

Mr. Bushey testified that he did not disclose the sale of the 2008 GMC Truck in his SOFA because he believed Sun Center owned the asset. His testimony that he considered Solarius to be a d/b/a of Alameda Assets also provides some explanation for his misidentification of Solarius instead of Alameda Assets as the source of his income from 2014 and 2015. While not finding that these omissions and misstatements meet the knowing and fraudulent standard required for denial of discharge under § 727(a)(4), they lend further support for the Court's conclusion that Mr. Bushey's false testimony at the Rule 2004 Exam and depositions was both knowing and fraudulent. These misstatements and omissions are consistent with Mr. Bushey's fraudulent scheme to sell Sun Center's assets to Alameda Assets and obtain a release of the lien

---

[12] Including Ms. De La Fuente's expenses on Schedule J would give the Chapter 7 Trustee and creditors a more accurate picture of the household finances. However, the Court is not deciding whether Mr. Bushey was required to list his girlfriend's expenses on his Schedule J.

16

from U.S. Bank, yet continue to treat the business as if he were its owner. Mr. Bushey's undisclosed sale of his 2008 GMC Truck funded Sun Center's "sale" of assets to Alameda Assets which Mr. Bushey presented to U.S. Bank and his creditors as an arm's length transaction. Similarly, by listing Alameda Assets as his current employer on Schedule J, while identifying Solarius as the source of his income for the 2014 and 2015, Mr. Bushey obfuscated his pre-petition employment history and suggested that his current employer was unconnected to his prior employer. Further, Mr. Bushey took an artificially reduced salary and made his girlfriend manager so that on the petition date, the higher salary would be attributed to her. And because Mr. Bushey technically no longer held an interest in Sun Center or Alameda Assets on the petition date, he did not have to disclose an interest in those entities in his bankruptcy schedules.

## CONCLUSION

A bankruptcy discharge is a privilege, not a right. *Juzwiak,* 89 F.3d at 427. *See also, Wieland v. Gordon (In re Gordon),* 509 B.R. 359, 370 (Bankr. N.D. Okla. 2014) ("'[A] discharge in bankruptcy is a privilege, not a right, and should only inure to the benefit of the honest debtor.'") (quoting *Juzwiak,* 89 F.3d at 427). Debtors "who 'play fast and loose with their assets or with the reality of their affairs'" may find themselves ineligible to receive a discharge. *Butler,* 377 B.R. at 927 (quoting *Boroff v. Tully,* 818 F.2d 106, 110 (1st Cir. 1987)).

Mr. Bushey actively planned and participated in two sham transactions: 1) the sale of Sun Center's assets to Alameda Assets; and 2) the sale of the membership interests in Alameda Assets to Charles O'Donnell. In both transactions, Mr. Bushey provided the money for the purchase price. He then lied about his role in these transactions at the Rule 2004 Exam, and at subsequent depositions given in connection with this bankruptcy case in an effort to hide these

17

business dealings from his creditors. These false statements, made under oath in connection with his bankruptcy case were knowing, fraudulent, and material, and warrant denial of discharge under § 727(a)(4).

Having denied Mr. Bushey's discharge under § 727(a)(4), the Court need not address Plaintiffs' remaining claims for denial of discharge under other subsections of § 727(a).

The Court will enter a separate order consistent with this Memorandum Opinion.

*[signature]*
ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket: March 22, 2017

COPY TO:

James Bartholomew Boone
Chappell Law Firm, P.A.
Attorney for Plaintiffs Roger Cronk, Nancy Cronk, Brandon Ashcraft, Amber Ashcraft, and Blonde and Bitter, LLC, 6001 Indian School Road NE, Suite 150
Albuquerque, NM 87110

Leonard Martinez Metzgar
Office of the United States Trustee
PO Box 608
Albuquerque, NM 87103

Christopher M Gatton
Giddens, Gatton & Jacobus, P.C.
Attorney for Defendant Scott Bushey
10400 Academy Rd., #350
Albuquerque, NM 87111